Filed 3/16/23; Modified and Certified for Publication 4/12/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br>v.<br>KEVIN LEROI OLIVER,<br>    Defendant and Appellant. | A161773<br><br>(San Mateo County Super. Ct.<br> No. SC026429B) |

Defendant Kevin Leroi Oliver appeals from the superior court's denial of his petition for resentencing under former Penal Code section 1170.95,[1] now renumbered as section 1172.6. (Stats. 2022, ch. 58, § 10.) After the trial court determined that Oliver had made a prima facie showing of eligibility for resentencing, a hearing was ordered pursuant to subdivision (d)(3) of former section 1170.95. Based upon the evidence presented at that hearing, the court denied the resentencing petition. Specifically—after finding beyond a reasonable doubt that Oliver was a major participant in enumerated underlying crimes who acted with reckless indifference to human life—the court concluded that he could still be convicted of first degree murder under

---

[1] All statutory references are to the Penal Code unless otherwise specified.

1

current law and was therefore ineligible for resentencing.  (See §§ 189, subds. (a) & (e)(3), 1176.2, subd. (a)(3).)  We affirm.

## I.  BACKGROUND

### A.  *The Murder Prosecution*

After a 1996 jury trial, Oliver was convicted of first degree murder for participating in a 1990 robbery/burglary with Robert Adger and Edward Bruce Grady during which Miguel Jimenez was killed.[2]  The underlying facts with respect to this murder prosecution are detailed in our previous unpublished opinion in this matter.  (*People v. Adger* (Sept. 2, 1998, A076756) (*Adger II*) [unpub. opn.].)  Here, we focus on the evidence from the record of conviction presented to the trial court on the single issue animating this appeal:  whether Oliver was a major participant in the underlying robbery/burglary who acted with reckless indifference to human life and is therefore ineligible for resentencing.  As that record discloses, the plan was for Grady to drive Adger and Oliver to Jimenez's house for an unusually large drug transaction involving three kilos of cocaine valued at approximately $60,000.  In the planning stages, Adger indicated he intended to kill Jimenez if he was alone.  Although his friend Alvis Chatman cautioned Oliver prior to

---

[2] This was the second trial of Adger and Oliver for Jimenez's murder. In their first trial, the jury convicted the two men of first degree murder, robbery, burglary, arson, and conspiracy to commit robbery and burglary. The jury also found true robbery and burglary special circumstances and allegations that Adger had used a gun and that Oliver was armed. Codefendant Grady was convicted of arson and of being an accessory to murder, but was acquitted of murder, robbery, and burglary.  After Adger and Oliver appealed, Division 4 of this First District reversed, concluding that the admission of the content of immunity agreements between the prosecution and three key witnesses constituted reversible error.  (See *People v. Adger* (June 14, 1994, A059466 & A059532) (*Adger I*) [unpub. opn.].)

the robbery to think about what he was getting himself into and consider his baby, Oliver disregarded Chatman's warning because he viewed it as "a chance for everything."

### i. Evidence of Prior Drug Dealing by Adger & Oliver

At the 1996 trial, Robert Contreras testified that Jimenez was his best friend and that he participated in drug deals with him in 1990. Contreras took part in drug deals involving Jimenez, Adger, Oliver, and Chatman approximately four times during this timeframe. On each occasion, Adger handled the money and Oliver accompanied him. He and Chatman were middlemen. Adger, Oliver, and Chatman were the only African-Americans with whom Jimenez dealt.

Jose Anguicano—a longtime friend of Jimenez—also testified that he witnessed a number of drug transactions involving Jimenez, Adger, Oliver, and Chatman in the months preceding the murder. During two of the transactions, Oliver went out to the car to get the money after he and Adger viewed the proffered cocaine. The day after Jimenez was murdered, Orozco (who was in the house at the time of the murder as discussed further below) told Anguicano that the shooting occurred during a drug deal with "the blacks" and that he got scared and jumped out the window.

### ii. Testimony of Chatman & Kight

At the time of the murder, Chatman was living in Newark with Adger, Oliver, Kimberly Kight, and Kight and Chatman's young twins.[3] Chatman had known Adger and Oliver for years, and Grady for all of his life. Adger and Oliver were in a rap group called "Young Life 2 Snow." Adger was "Young Life," and Oliver was "Snow," but they did not make much money.

---

[3] Chatman died after the first trial in this matter. Thus, his testimony from the first trial was read to the jury during the second trial.

Chatman made money by selling drugs and did business with Jimenez. Adger and Oliver also sold drugs, and the three had participated in drug transactions with Jimenez on numerous occasions, generally involving a kilo or two of cocaine. Chatman was the middleman. Adger would ask him to find someone willing to sell him drugs. Chatman would work with Jimenez to obtain the drugs. If Chatman could get more than the base price per kilo, he and Jimenez would split the extra money.

On October 16, 1990, Chatman arrived at the Newark residence with a girlfriend, where he found Adger and Oliver sitting on the couch. Adger was talking with Jimenez on the phone. After the call, Adger asked the girlfriend to excuse herself so he could talk to Chatman, and the three men (Adger, Oliver, and Chatman) sat on the couch together. Adger then explained that he had set up a three-kilo deal with Jimenez; that he was going to rob him; and that, if Jimenez was there alone, he would "kill him, shoot him"—he would "do what he had to do." When Chatman asked Adger why he wanted to rob Jimenez, Adger responded that Jimenez was "just a Mexican" and that he was going broke.

Adger asked Chatman to drive, but he refused. Adger then repeatedly pressed Chatman to lend him his car. At one point, Adger stated he "might not even do" what he said he was "going to do," but if anything happened to Chatman's car, he would buy it from Chatman. Eventually, the two men agreed to switch vehicles. Although Chatman liked Jimenez and Adger had said he planned to rob and kill him, Chatman agreed to let Adger use his car because he did not want it anymore and was going to sell it. Adger then made a few calls and Grady arrived. The two men went into Adger's room. At that point, Chatman told Oliver that he "should think about what he gonna do, what he's doing." He suggested Oliver think about his baby and

4

about what he was getting himself into.  Oliver responded that he had thought about it but "it was a chance for everything."  Thereafter, Adger, Oliver, and Grady drove off in Chatman's car.

Later that evening, Oliver contacted Chatman, repeatedly telling him to come home.  Chatman stated:  "I hope you all didn't do what I think you did." And Oliver responded: "Yeah.  Yeah.  Yeah.  Come home." After returning to the residence, Chatman agreed to go to the movies with Adger, Oliver, and Grady at Adger's request.  Chatman rode with Oliver, who told him that he and Adger had gone into the house and seen Jimenez and the drugs.  After they were shown the cocaine, Adger looked at Oliver and then jumped up, pulled the gun out, and shot Jimenez in the chest.  Jimenez jumped up and started running, at which point Adger ran after him and shot him again.  According to Oliver, Grady got a half of a kilo for driving, he got a kilo for going into the house with Adger, and Adger got a kilo and a half for doing the shooting.  After the movie, the four men returned to the house, and someone said, "[l]et's go do what we [have] to do" and get rid of the car.  Chatman refused to go along, so Adger drove off in his car, and Oliver and Grady drove off in Chatman's car.  Chatman never saw his car again.

Chatman didn't really believe what had happened until he was at a 7-Eleven with Oliver and Adger, and Adger read about the homicide in a newspaper, which reported the death of Jimenez, a gardener and drug dealer.  Chatman was scared and didn't know how to react.  Adger looked at him and stated:  "Don't look at us like we killers . . . . It's something we did, we had to do." Shortly thereafter, Adger asked Chatman to bring a kilo to him at his aunt's house.  Chatman did so, finding Adger at the house with Oliver and a third person.  Oliver cooked the powder into rock cocaine.  Later that

evening, Adger bought a car for one-half ounce of cocaine and gave it to Chatman.

During the week after the murder, Chatman drove Adger and Oliver to a basketball game at Jordan, a school in Palo Alto. On the way, they stopped at Oliver's mother's house. Oliver jumped the fence and came back out with a brown bag, which he explained held the "gat," meaning the gun. Chatman dropped Oliver and Adger off with their gym bags and the bag with the gun. When he picked them up several hours later, they no longer had the bag with the gun.

In November 1990, before he talked to the police for the first time, Chatman discussed with Adger, Oliver, and Kight what he should say to them. Oliver and Adger told Chatman he could tell the police anything, as long as he did not disclose that they had his car. Chatman felt stuck and did not know what to do. At that point, Oliver stated: "What you scared for, you all didn't do it, we did it, you all didn't do it." Later, Oliver clarified: "I just don't want you all to take me away from Justin [his son]." Adger was repeatedly shaking his head and commented: "Damn. I should never have fucked with that Mexican." Chatman thought he was a suspect in the murder, and he was trying to protect himself and his friends, so when he was first interviewed by the police, he lied a lot. It was also dangerous to be a snitch.

After the police interview, Chatman went to Texas for a month with Kim and their children because he was scared. Eventually, however, after connecting by telephone with a detective from Redwood City, he came back and spoke again to the police. In a December 1990 pretext call with Oliver, Chatman complained: "Me and Kim ain't did shit. How did we get into this shit, man? I going down." Oliver responded: "Kim ain't in nothing. You

6

ain't in nothing neither." Chatman ultimately testified at trial under a grant of immunity from the prosecution.

Kimberly Kight testified (also under a grant of immunity) that, in October 1990, she lived with her two children, Chatman, Adger, and Oliver in Newark. Chatman was the father of her children. Adger, Oliver, and Chatman all earned their money by dealing drugs, with Adger generally giving the instructions. On the night of October 16, 1990, Kight arrived home around 8:00 p.m. and she and Chatman went to the mall to get food for dinner. When they returned to the residence, Adger, Oliver, and Grady were present. Kight received a call around 4:00 a.m. that Chatman's car (which was in her name) had been found burned. Chatman explained that Adger "and them" did something in the car and it was not safe to drive, but Adger had told him if the car was not returned, he would buy them a new one.

When she was interviewed by the police in November 1990, Kight lied for four or five hours before telling the police what Chatman had told her about the car. When she met with Chatman, Oliver, and Adger after being interviewed by the police, Adger stated that "he wished he would have never fucked with that Mexican" and Oliver stated, "just don't take me away from Justin." When she recounted to Adger and Oliver what she had told the police, Oliver commented: "You guys don't have anything to do with it, you guys was nowhere around, and you all really don't know what happened. The only people know what happened is the people that was there." Adger told Chatman to tell the police he loaned the car to an individual named Pooh. When Chatman spoke to Kight in private during his first police interview, he told her he was scared and did not know what to do: "He wanted to know what he should do, if he should tell the truth. He didn't want to get his friends in trouble."

### iii. *Testimony of Luis Orozco, the Cocaine Supplier*

The day of the murder, Jimenez called Orozco, a cocaine supplier, and asked him for three kilos. Orozco had previously supplied Jimenez with cocaine around 25 times. At that time, a kilo sold for $20,000.[4] Orozco was instructed to deliver the drugs and wait for the money. He had never before supplied Jimenez with that much cocaine. Around 5:00 p.m., some people arrived, and Orozco went into a nearby room because he did not want to be seen. Out of curiosity, he took a quick peek out of the door and saw a man wearing dark sunglasses and a black trench coat with curly, frizzy hair to the shoulder. He could not hear any talking because the television was on, but shortly thereafter he heard loud shots. Wanting to get out of there, he pushed through a window screen and jumped out the window. As he was leaving the area, Orozco saw a car with three men in it. He later identified Adger in an in-person lineup as the man he had seen in the house and in the front passenger seat of the car.

### iv. *Other Prosecution Evidence*

A police officer who responded to Jimenez's house on the night of the murder testified that he discovered Jimenez lying on his stomach in the hallway. Another officer went through a closed bedroom door and found a window open with the screen lying outside. The pathologist who performed the autopsy on Jimenez identified one gunshot wound to the front of the chest, one on the posterior shoulder, and one on the back of the head. According to a criminalist involved in the case, the gunshot to Jimenez's chest came from no more than two feet away and bloodstains at the scene

---

[4] Orozco testified at the first trial pursuant to an immunity agreement. He exercised his Fifth Amendment rights and refused to testify at the second trial as he was under indictment in a federal matter. Thus, his testimony from the first trial was read to the jury.

were consistent with Jimenez being shot in the chest while sitting on the couch.  Numbers retrieved from a pager on the couch indicated that Jimenez received a mid-day page on the day of the murder from a telephone at the Newark address listed in the name of Annette Adger.  He returned the call shortly thereafter from a public phone at a governmental office where he had driven his aunt.  A call was then made from the same public phone to a phone number associated with Orozco's sister.  An inspector for the prosecution testified that he had discovered an article in the Redwood City Times Tribune dated October 17, 1990, which discussed Jimenez's murder as possibly drug related and mentioned he was a landscape gardener.

A number of Jimenez's neighbors also testified regarding the aftermath of the murder.  For example, Pamela S. heard gunshots, looked out the window, and saw two black men leave the Jimenez residence and drive away.  When they left the house, the men "strutted" to the car as though they were proud of themselves.  Michael P. was sitting on his front porch when he saw three black males drive by very slowly.  They parked in front of Jimenez's residence.  About five minutes later, the car drove by very fast, and all of the people in the car were laughing.  Hugh B., another neighbor, identified Grady as the driver of the car at an in-person lineup.

On October 19, 1990, a custodian at Jordan Junior High School in Palo Alto found a very heavy brown shopping bag in a trash can from the boy's bathroom.  The bag contained a gun, loose bullets, empty casings, and a box of bullets.  It had not been there the previous afternoon.  The parties stipulated that Adger and Oliver were in a basketball league that played at the school on Thursday nights in October 1990.  A criminalist opined that one of the three bullets taken from Jimenez's body came from the recovered gun.  The other two were most likely also fired from that gun.  A forensic specialist

testified regarding the burned car owned by Kight, stating that there was no sign of forced entry into the car, there was a lighter fluid can on the car's front seat, and the lighter fluid was used to intentionally set the car on fire. A latent fingerprint matching Oliver was found on the lighter fluid can.

> v.    *Operative Information, Verdict & Sentencing*

The operative third amended information in this case, filed by the San Mateo County District Attorney on June 28, 1996, just before the case was argued, charged Oliver and Adger with the murder of Jimenez (§ 187, count 1), conspiracy to commit robbery and burglary (§§ 182, 211, 460, count 2), robbery (§ 211, count 3), and residential burglary (§ 460.1, count 4). With respect to both defendants, the amended information also alleged felony-murder special circumstances. (See §§ 187, 190.2, subd. (a)(17)(A) [robbery felony murder] & (a)(17)(G) [burglary felony murder].) And it alleged that, during the commission of the robbery, burglary, and murder, Oliver was armed with a firearm and Adger personally used a firearm. (§§ 12022, subd. (a) & 12022.5, subd. (a).)

On July 18, 1996, a jury convicted both Oliver and Adger of first degree murder with the felony-murder special circumstances. Both men were also convicted of robbery, burglary, and conspiracy to commit those crimes. In addition, the jury found true the three enhancements for being armed with a firearm with respect to Oliver. The jury found not true the three enhancements alleging Adger's personal use of a firearm.

Oliver was sentenced on December 23, 1996, to life without the possibility of parole, consecutive to a one-year determinate term for the arming enhancement. All of his remaining convictions were stayed pursuant to section 654. As stated above, in September 1998, we affirmed both Oliver's and Adger's convictions. (*Adger II*, *supra*, A076756).)

## B.    *Resentencing Petition*

On April 25, 2019, Oliver filed a petition to have his murder conviction vacated and to be resentenced under former section 1170.95.  On November 5, 2019, the court concluded Oliver had made a prima facie showing for relief and set the matter for hearing.  The prosecutor's request for reconsideration of this prima facie finding was denied on July 14, 2020.[5]

After briefing and argument by the parties and review of the stipulated record of conviction and additional trial exhibits, the trial court denied the petition on December 31, 2020.  Specifically, the trial court concluded that Oliver was ineligible for resentencing because he was unable to establish one of the necessary criterion for relief—that he could not now "be convicted of murder or attempted murder because of changes to Section . . . 189 made effective January 1, 2019."  (§ 1172.6, subd. (a)(3).)  Pursuant to those changes, a felony murder conviction is still allowable if the defendant "was a major participant in the underlying felony and acted with reckless

---

[5] At the second trial in 1994, Oliver's jury found true beyond a reasonable doubt felony-murder special circumstances, apparently on the basis that Oliver was a major participant who acted with reckless indifference to human life while engaged in the commission of felonies which resulted in the killing for which he was convicted.  (See §§ 189, subd. (e), 190.2, subd. (a)(17)(A) & (G).)  The prosecutor argued that these jury findings should preclude establishment of a prima facie case for purposes of possible resentencing.  However, the verdict in Oliver's case was rendered years before our Supreme Court clarified the law of felony murder liability in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).  Recently, in *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*), the Supreme Court definitively resolved a split among appellate courts, holding that "[f]indings issued by a jury before *Banks* and *Clark* do not preclude a defendant from making out a prima facie case for relief under" section 1172.6.  (*Strong,* at p. 710.)  Thus, the trial court correctly proceeded to a hearing in this case.

indifference to human life." (§ 189, subd. (e)(3).) The trial court found beyond a reasonable doubt that there was sufficient evidence in the record to demonstrate that Oliver could still be convicted of felony murder on this basis. This appeal followed.

## II. DISCUSSION

### A. *Legal Framework*

Effective January 1, 2019, Senate Bill No. 1437 amended the felony-murder rule to provide: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2 [the statute defining felony-murder special circumstances]." (§ 189, subd. (e).) The new law was designed "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

The Legislature also added former section 1170.95 (now section 1172.6), which creates a procedure for offenders previously convicted under a felony-murder theory to obtain the benefits of these changes retroactively. Under the statute, individuals convicted of murder can petition for relief in the court where they were sentenced if (1) the complaint or information filed against them "allowed the prosecution to proceed under a theory of felony

12

murder . . . ," (2) they were convicted of murder following a trial, and (3) they could not now be convicted of murder "because of changes to [s]ection 188 or 189." (Former § 1170.95, subd. (a); see now § 1172.6, subd. (a).) In most cases where the petitioner makes a prima facie showing that he or she is entitled to relief, the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under state law as amended by Senate Bill 1437. (§ 1172.6, subd. (d)(3).) "A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid.*)

In 2015 and 2016, our high court "substantially clarified the law governing findings under Penal Code section 190.2, subdivision (d)" in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522. (*Strong*, *supra*, 13 Cal.5th at p. 706.) "*Banks* elucidated what it means to be a major participant and, to a lesser extent, what it means to act with reckless indifference to human life, while *Clark* further refined the reckless indifference inquiry." (*Strong*, at pp. 706–707.) Specifically, *Banks* considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." (*Banks*, at p. 794.) The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or

13

her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.) However, whether a defendant acted as a major participant depends on the totality of the circumstances. (*Id.* at p. 802.) Moreover, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Id.* at p. 803.)

Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark, supra,* 63 Cal.4th at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, the defendant must consciously disregard risks known to him or her. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involve[d] a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Ibid.*) However, the mere fact that a robbery involves a gun is insufficient on its own to establish reckless indifference to human life. (*Id.* at pp. 617–618.)

*Clark* listed factors to consider when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of

14

the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].) As with a major participant finding, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618; see also *Scoggins*, at p. 683 ["[d]etermining a defendant's culpability under [section 190.2, subdivision (d)] requires a fact-intensive individualized inquiry"].)

## B.    *Standard of Review*

Relying on *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), Oliver contends that, because the trial court's inquiry in this case was limited to a cold record, deference to the court's factual findings on appeal is inappropriate. We are not persuaded. In *People v. Perez* (2018) 4 Cal.5th 1055 (*Perez*), our Supreme Court considered and rejected an argument similar to Oliver's in the context of a Proposition 36 petition for recall of sentence. The People argued that de novo review was "more appropriate because trial courts do not have an advantage over appellate courts in determining eligibility based on the record of conviction." (*Perez*, at p. 1066.) The Supreme Court disagreed, concluding that "even if the trial court is bound by and relies solely on the record of conviction to determine eligibility, [where] the question . . . remains a question of fact . . . we see no reason to withhold the deference generally afforded to such factual findings." (*Ibid.*)

*Vivar*, *supra*, 11 Cal.5th 510, is distinguishable. There, our high court endorsed an independent standard of review when evaluating a trial court's decision under section 1473.7 regarding whether to vacate a conviction due to

negative immigration consequences. (*Vivar*, at pp. 524–527.) "A successful section 1473.7 motion requires a showing, by a preponderance of the evidence, of a prejudicial error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea." (*Vivar*, at p. 517, italics omitted.) In choosing independent review in this context, the Supreme Court reasoned that analogous prejudice determinations in ineffective assistance of counsel claims were reviewed independently as predominantly legal questions; that the interests at stake supported independent review where the determination was likely to be made from a cold record; and that prior appellate decisions had reviewed such prejudice determinations independently, but the Legislature, aware of this standard, did not alter it when amending the statute. (*Id.* at pp. 524–527.) The Supreme Court went on to emphasize that it's holding was "a product of multiple factors with special relevance" in that context (*id.* at p. 527) and reaffirmed the "familiar postulate" that " 'an appellate court should defer to the factual determinations made by the trial court,' " regardless of " 'whether the trial court's ruling[s are based] on oral testimony or declarations' " (*id.* at p. 528, fn. 7).

We conclude that *Perez*, rather than *Vivar*, controls here. Whether Oliver was a major participant in the underlying felonies who acted with reckless indifference to human life is predominantly a factual question reviewable for substantial evidence. Other courts considering the issue have reached a similar conclusion. (See *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232–233 [Division Four of this First District rejecting *Vivar* and concluding that whether the petitioner knew or reasonably should have known that the victim was a police officer under the resentencing statute was predominantly a factual question reviewable for substantial evidence]; *People*

16

*v. Mitchell* (2022) 81 Cal.App.5th 575, 590–591 (*Mitchell*) [Second District rejecting *Vivar* and concluding that "substantial evidence support[ed] the finding, beyond a reasonable doubt, that Mitchell was a major participant in a felony who acted with reckless indifference to human life"]; *People v. Clements* (2022) 75 Cal.App.5th 276, 283, 302 [Fourth District rejecting *Vivar*; concluding that "the trial judge sits as a fact finder at a hearing under section 1170.95, subdivision (d) [now section 1172.6, subd. (d)] and that substantial evidence support[ed] the trial judge's finding beyond a reasonable doubt that Clements committed implied malice second degree murder"] (*Clements*).)

In reviewing the trial court's findings for substantial evidence, we apply well settled principles. "We " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt." ' " [Citation.]  Our job on review is different from the trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements*, *supra*, 75 Cal.App.5th at p. 298; accord, *Clark*, *supra*, 63 Cal.4th at p. 610.)

## C.  *Resentencing Hearing*

As mentioned above, the trial court held the resentencing hearing on December 31, 2020.  By stipulation of the parties, the court had reviewed a thumb drive containing relevant portions of the record of conviction in the

17

case, which was admitted into evidence. At the request of the parties, a number of additional exhibits were considered and admitted at the hearing. The prosecutor then discussed relevant evidence and argued there was clearly evidence beyond a reasonable doubt that Oliver "engaged in a planned murder with at least a shared intent to kill" or, at the very least, "was a major participant who acted with reckless indifference to human life." Oliver's counsel disagreed, stressing that Chatman, who supplied much of the relevant evidence in this context, was a co-conspirator and known liar.

After argument, the trial court issued its detailed ruling, noting preliminarily that the prosecution bore the burden at the hearing of "proving beyond a reasonable doubt each element of first- or second-degree murder under the current law to establish ineligibility for resentencing."[6] The court found insufficient evidence in the record to prove beyond a reasonable doubt that Oliver was the actual killer or that he harbored the actual intent to kill

_____

[6] Oliver's argument on appeal that the trial court improperly applied a substantial evidence standard in making its findings is not well taken. He bases this claim on the trial court's comments that there was "sufficient evidence" to establish beyond a reasonable doubt that Oliver was guilty of first-degree murder under current law. However, the court started and ended the hearing by indicating the burden was on the prosecution to "prove ineligibility beyond a reasonable doubt." The prosecutor repeatedly stated he had marshalled proof beyond a reasonable doubt during the hearing, and defense counsel noted the prosecution's concession that the reasonable doubt standard applied. And, if that wasn't enough, the court explicitly rejected a case suggesting a substantial evidence standard of review (*People v. Duke* (2020) 55 Cal.App.5th 113, 123, vacated Nov. 23, 2021, S265309) and adopted a case "requiring the prosecutor to prove beyond a reasonable doubt each element of first- or second-degree murder under current law in order to establish ineligibility" (*People v. Lopez* (2020) 56 Cal.App.5th 936, 949, vacated Dec. 22, 2021, S265974) as the "more persuasive." Under such circumstances, the court's passing reference to "sufficient evidence" could only mean that there was "enough evidence" to prove the required facts beyond a reasonable doubt. We see no error.

Jimenez. Thus, to avoid resentencing, the prosecution had to prove beyond a reasonable doubt that Oliver acted with reckless indifference to human life as a major participant in the felonies that caused Jimenez's death.[7]

With respect to reckless indifference—i.e., "knowingly engaging in criminal activity that the participant knows involves a grave risk of death"— the court found the record sufficient to prove beyond a reasonable doubt that Oliver knew Adger was armed with a lethal weapon that he intended to carry with him during the robbery/burglary; Oliver knew a single lethal weapon was involved, was likely to be used, and was used during the crimes; Oliver had the opportunity to either stop the killing or assist Jimenez and did nothing to minimize the possibility of violence; and Oliver was aware that Adger had stated he intended to kill Jimenez if he was alone. Based on these findings, the court concluded beyond a reasonable doubt that Oliver acted with reckless indifference to human life.

In considering whether Oliver was a major participant in the underlying felonies, the court concluded that Oliver did not play a substantial role in planning the crime and did not supply or use the lethal weapon. However, the court concluded the "most significant factor" in defining Oliver's role as a major participant was the fact that he was aware before he got in the car that Adger intended to kill Jimenez if he was alone. The court concluded this went beyond merely knowing that a gun was present at the scene of the robbery. And the court found, beyond a reasonable doubt, that

---

[7] The trial court concluded that the other necessary elements of the crime had been established by the 1996 jury verdicts finding Oliver guilty of conspiracy to commit robbery and burglary, first-degree robbery, and first-degree residential burglary, as well as the trial testimony that Jimenez was shot three times during the robbery and burglary and that one of the bullets pierced his heart and caused his death.

Oliver's actions in accompanying Adger and acting as a backup during the transaction, as well as his inaction in failing to prevent the continued firing on the victim, played a role in Jimenez's death. Finally, after the murder, Oliver assisted in taking the cocaine from the residence; accepted his portion of the cocaine; assisted in cooking the cocaine for distribution; secreted the gun in his mother's home; and assisted in disposing of the gun. On this basis, the court concluded, beyond a reasonable doubt, that Oliver was a major participant in the robbery and burglary that led to the killing of Jimenez. Given its factual findings, the court denied the resentencing petition.

### D.   *Substantial Evidence Supports the Trial Court's Findings*

On appeal, Oliver argues that the prosecution's evidence was insufficient to carry its burden establishing him as a major participant who acted with reckless indifference to human life during the 1990 robbery and burglary. Specifically, he asserts that the findings rest overwhelmingly on Chatman's testimony. But, he argues, Chatman was a copious liar; repeatedly gave different versions of crucial statements reportedly made by Adger; was "wildly self-interested" as he had been viewed as a prime suspect in the crimes; was not cross-examined on crucial statements during the original trial in 1992; and never confirmed that Oliver actually heard Adger's plan to kill Jimenez. However, we have already rejected Oliver's suggestion that we should review the resentencing record independently and without deference to the trial court's factual findings. Under our substantial evidence standard of review, we defer to the trial court's implicit credibility findings and accept all reasonable inferences from the evidence. Thus, Oliver's arguments necessarily fail.

First, with respect to the major participant finding, it is true that there was no evidence that Oliver planned the crime, supplied a weapon, or carried

20

a weapon. However, as our high court has counseled, "[n]o one" of the factors it has identified as relevant in this context "is necessary." (*Banks*, at p. 803.) Oliver was present during the planning of the crime. And he downplays the importance of his physical presence as backup throughout the crimes, a status which was confirmed by his receipt of the second largest portion of the stolen cocaine. It was established at trial that Oliver is six feet, four inches tall and, at the time of the crimes, weighed 225 pounds. Thus, his presence no doubt helped facilitate the completion of the planned robbery/burglary.

Moreover, Oliver knew it was likely Adger would use lethal force during the underlying crimes and there is no evidence he ever took any action to dissuade Adger from committing murder or warn Jimenez, either before or during the crimes. Indeed, Adger reportedly looked at Oliver immediately before pulling out his gun and shooting Jimenez. A reasonable inference from this fact is that Adger was looking for confirmation that Oliver was on board with the plan and ready to back him up. Yet Oliver took no action at this crucial time, and this inaction clearly played a role in Jimenez's death. Finally, after the shooting, Oliver did not act surprised or upset. Instead, he and Adger simply removed the cocaine from the residence and drove away. Later, Oliver assisted in cooking a portion of the cocaine; secreted the gun in his mother's home; and assisted in disposing of the car and the gun. In sum, substantial evidence supports the trial court's conclusion that Oliver's participation in the underlying crimes was sufficiently significant to be considered "major."

As for the reckless indifference finding, we agree, as stated above, that knowing participation in an armed robbery is not sufficient, on its own, to demonstrate reckless indifference. Here, the evidence supports the inference that Oliver was aware Adger likely *intended to use* a firearm during the

21

robbery/burglary *to kill* Jimenez and did nothing to minimize this grave risk of death.  (Compare *Clark, supra*, 63 Cal.4th at p. 621 ["A defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death.' "].)  Again, Oliver's status as Adger's second in command cannot be ignored.  Oliver had multiple opportunities to object to the planned murder, but he did not do so.  After the shooting, he did not go to the aid of the victim.  Instead, he was seen by one witness "strutting" back to the car.  And another witness saw all three of the vehicle's passengers laughing as they drove away.  Nor does it seem that, after the event, Oliver expressed any outrage.  Rather he helped process the cocaine and cover up the crimes.  A reasonable inference from his behavior is that he simply did not care whether Jimenez ended up dead because the crime was his "chance for everything."  Substantial evidence thus supports the trial court's conclusion that Oliver acted with reckless indifference to human life.

At bottom, Oliver is really arguing that Chatman's testimony was simply too unreliable to be trusted as the basis for the court's major-participant and reckless-indifference findings, made beyond a reasonable doubt.  Or, as Oliver puts it:  "Chatman's testimony is far too slender and sickly a reed to bear this weight."  We disagree.  As stated above, the trial court impliedly found the relevant portions of Chatman's testimony credible, and we cannot second-guess that conclusion.  Moreover, " ' '[t]he uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." ' " (*People v. Panah* (2005) 35 Cal.4th 395, 489.)  While admittedly a liar with his own interests at stake, we do not find Chatman's

22

testimony impossible or improbable, largely because so many aspects of it were corroborated by other evidence.

Indeed, as we recognized in our prior opinion in this matter, the prosecutor conceded that Chatman had a motive to lie to the police and did in fact lie and conceal information from them. He urged the jury to believe Chatman's trial testimony despite those lies because it was corroborated by other evidence. (*Adger II*, *supra*, A076756).) While considering an unrelated appellate issue, we listed some of this corroborating evidence, including: the testimony of Contreras and Anguiano regarding Jimenez's drug dealing with Adger and Oliver; the records detailing telephone calls to and from Jimenez on the day he was killed; Orozco's testimony about what he saw just before Jimenez was shot; the discovery of Oliver's fingerprint on the lighter fluid can in Chatman's burned car; the discovery of the gun in a garbage can at the school where Adger and Oliver played basketball; and Kight's testimony Adger told her to lie to the police about the car. (*Ibid.*) To this corroborating evidence we add: police officers' observations of the crime scene; the pathologist's testimony regarding the location of the gunshot wounds; the criminologist's bloodstain testimony; the newspaper article discovered by the prosecutor's investigator; Kight's corroboration of statements made by Adger and Oliver when she and Chatman met with them after her interview with the police; Kight's testimony regarding Oliver and Adger's drug dealing; Orozco's identification of Adger at the crime scene; and a neighbor's identification of Grady as the driver of the car. In short, Chatman's testimony was consistent with much of the other evidence presented by the prosecution at trial and gained credibility on that basis.

Finally, we reject Oliver's assertion that there is no evidence in the record that he was actually present and/or heard and understood Adger when

23

Adger stated he was going to kill Jimenez if he was alone during the robbery/burglary. Chatman testified that he, Adger, and Oliver were all sitting together on the couch when Adger disclosed his plans to rob and possibly kill Jimenez. It is a reasonable inference from this evidence that Oliver heard what Adger said. Moreover, Oliver was Adger's confederate for all of their drug dealings and the two shared an extremely close personal relationship, living together, playing basketball together, and fronting a rap group together. Indeed, Oliver clearly knew key details regarding the plan. For instance, he knew there was an unusually large payoff involved in contrast to their usual, less lucrative transactions. It was, he told Chatman shortly afterwards, "a chance for everything." It's implausible to suggest that Oliver was aware of the plan to rob Jimenez but failed to hear Adger's statement about killing the drug dealer, especially given Chatman's warning to Oliver to consider what he was getting himself into and Oliver's apparent lack of surprise when Adger pulled out his gun and shot Jimenez a few minutes after they arrived for the drug transaction.

### E.    *Consideration of Oliver's Youth*

Oliver was 23 years old at the time of the Jimenez murder. After briefing in this case was complete, we granted Oliver's request to file a supplemental brief challenging, for the first time, the trial court's denial of his resentencing petition on grounds that the court failed to consider his youthful age when making its reckless-indifference and major-participant findings. Specifically, relying on a recent opinion from our colleagues in Division Five of this District—*People v. Jones* (2022) 86 Cal.App.5th 1076 (*Jones*)—Oliver contends that this matter must be reversed and remanded so that the trial court can expressly consider his youth as part of the totality of circumstances relevant to whether he was a major participant who acted with

24

reckless indifference to human life.  In response, the Attorney General argues variously that Oliver has forfeited this issue by failing to raise his youth in the trial court; that his argument fails on the merits; and that any error that may have occurred was harmless. We conclude that, if there was any error, it was harmless on these facts.

### 1.    *Development of the Law Regarding Youthful Offenders*

In *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*) the United States Supreme Court concluded that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment.  (*Id.* at p. 470.)  In doing so, it reiterated that " 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' " and that "those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, [their] ' "deficiencies will be reformed." ' " (*Id.* at p. 471–472, quoting *Graham v. Florida* (2010) 560 U.S. 48, 68 (*Graham*).)

California has increasingly legislated with these psychological and neurological differences in mind.  For example, "[e]ffective January 2018, section 3051 was amended . . . to require youth offender parole hearings for offenders who committed their crimes when they were 25 years of age or younger.  (Stats. 2017, ch. 675, § 1.)  According to the author of the amendment, ' "AB 1308 would align public policy with scientific research. . . . Scientific evidence on adolescence and young adult development and neuroscience shows that certain areas of the brain, particularly those affecting judgement and decision-making, do not develop until the early-to-mid-20s.  Research has shown that the prefrontal cortex doesn't have nearly the functional capacity at age 18 as it does at 25.  The prefrontal cortex is

responsible for a variety of important functions of the brain including: attention, complex planning, decision making, impulse control, logical thinking, organized thinking, personality development, risk management, and short-term memory. These functions are highly relevant to criminal behavior and culpability." ' " (*In re Jones* (2019) 42 Cal.App.5th 477, 485 (conc. opn. of Pollack, P.J.), quoting Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1308 (2017–2018 Reg. Sess.) as amended March 30, 2017, pp. 2–3.)

In a related vein, section 4801 was amended to provide: "When a prisoner committed his or her controlling offense . . . when he or she was 25 years of age or younger, the board, in reviewing a prisoner's suitability for parole . . . , shall give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).) And, effective January 1, 2022, prosecutors must now consider a defendant's youthful age as a mitigating factor during plea negotiations. (§ 1016.7, subd. (a)(2); see Stats. 2021, ch. 695, § 4.) For purposes of this provision, a youth "includes any person under 26 years of age on the date the offense was committed." (§ 1016.7, subd. (b).)

Recently, several appellate courts have addressed the relevance of a defendant's youth when conducting an analysis of major-participant and reckless-indifference findings under *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522. The appellate court in *People v. Harris* (2021) 60 Cal.App.5th 939, abrogated on other grounds by *People v. Lewis* (2021) 11 Cal.5th 952, remanded the matter for a resentencing hearing under subdivision (d) of former section 1175.95 because the record of conviction did not establish as a matter of law that Harris, 17 years old at the time of his

arrest, was ineligible. (*Id.* at pp. 944, 959–961.) In its discussion of the major participation requirement, the court cited *Miller* and *Graham* and commented: "[G]iven Harris's youth at the time of the crime, particularly in light of subsequent case law's recognition of the science relating to adolescent brain development [citations], it is far from clear that Harris was actually aware 'of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants.'" (*Id.* at p. 960.)

Next, in *In re Moore* (2021) 68 Cal.App.5th 434 (*Moore*), our colleagues in Division Three of this District found insufficient evidence that Moore acted with reckless disregard to human life "upon consideration of the factors identified in *Clark* together with Moore's youth at the time of his offenses." (*Moore*, at p. 451.) First, many of the *Clark* factors suggested that Moore "did not act with the requisite reckless indifference to human life." (*Moore*, at p. 452.) Second, citing *Harris* and *Miller,* the court concluded that, even if the evidence supported "a finding of reckless indifference for an adult, it is not sufficient to establish that Moore, who was 16 at the time of the shooting, had the requisite mental state." (*Moore*, at pp. 453–454.) Rather, concluding that "the 'hallmark features' of youth—'among them, immaturity, impetuosity, and failure to appreciate risks and consequences'—are arguably more germane to a juvenile's mental state than to his or her conduct" (*id.* at p. 454), the appellate court held that "a defendant's youth is *a relevant factor* in determining whether the defendant acted with reckless indifference to human life" (*ibid.*, italics added). When the court viewed the evidence through "the lens of Moore's youth," it could not "conclude beyond a reasonable doubt that Moore was subjectively aware that his actions created a graver risk of death than any other armed robbery." (*Ibid.*)

Finally, in *Jones*, *supra*, 86 Cal.App.5th 1076, defense counsel argued at resentencing that Jones was only 20 at the time of the crime and " 'immature.' " (*Id.* at p. 1091.) Citing *Miller* and *Graham*, counsel asked the court to consider Jones's youth on the basis that " 'recklessness is a hallmark of youth, but it does not alone demonstrate a reckless disregard for the value of human life." (*Jones*, at p. 1091.) In addition, a defense sentencing report contained in the record of conviction asserted that Jones had a "traumatic and violent" upbringing as well as under-diagnosed mental health and substance abuse issues, and "appeared to be impulsive rather than criminally sophisticated." (*Ibid.*) When denying resentencing, however, the trial court failed to discuss Jones's youthful age or maturity level. (*Ibid.*)

The *Jones* court determined that, given the recentness of *Harris* and *Moore*, it could not assume that the trial court had followed the law and considered Jones's youth in its *Banks/Clark* analysis. (*Jones, supra*, 86 Cal.App.5th at p. 1092.) It held that "in addition to the *Banks* and *Clark* factors, a defendant's youthful age *must* be considered." (*Jones*, at p. 1088, fn. 7, italics added; see also *id.* at p. 1091 ["The *Banks* and *Clark* factors are not exclusive. . . . [T]he totality of the circumstances necessarily includes the defendant's youthful age."].) Although the court recognized that Jones was 20, it concluded "in the interest of justice" that it was "best for the trial court to have a meaningful opportunity to consider Jones's youth as part of the totality of the circumstances germane to determining whether he was a major participant who acted with reckless indifference to human life." (*Id.* at p. 1093.)

### 2.    *The Failure to Consider Youth was Harmless*

Oliver concedes that defense counsel did not highlight his age or rely on youth as a factor weighing against his culpability for Jimenez's murder before

the trial court. The Attorney General therefore preliminarily argues Oliver has forfeited this issue on appeal. However, we decline to find forfeiture on these facts.

As stated above, Oliver's resentencing petition was filed in April 2019 and denied in December 2020. *Harris* was issued in February 2021, and *Moore*—the first case expressly holding that a defendant's youth is a relevant factor in a *Banks*/*Clark* analysis—was issued in August 2021. Finally, *Jones* did not conclude until January 2023 that, "[i]n addition to the *Banks* and *Clark* factors, a defendant's youthful age must be considered" when determining whether a defendant "was a major participant and acted with reckless indifference to human life based on the *totality* of the circumstances." (*Jones*, *supra*, 86 Cal.App.5th at p. 1091; see also *id.* at p. 1088, fn. 7.) Under these circumstances, we agree with the court in *Jones* that "it is unlikely in this particular instance that the trial court [or the parties] could have known to consider [Oliver's] age and maturity level, particularly to the extent now required by cases issued after [the resentencing] hearing." (*Jones, supra*, 86 Cal.App.5th at p. 1092.)

Turning to the merits, we acknowledge the trajectory of the legislation and case law recognizing the psychological and neurological differences between youthful and adult offenders, which both lessen the culpability of the young and increase the likelihood of their rehabilitation. However, we leave for another day the task of establishing the parameters of our colleagues' holding in *Jones*. Thus, for example, we need not articulate the appropriate definition of "youthful" in this context. Nor do we determine whether it is incumbent upon a trial court to expressly consider youth as part of its *Banks*/*Clark* analysis even when age is not raised by the defense. Rather, we conclude that, even if the trial court was required to expressly consider

Oliver's youth, any such error in this regard is harmless under the specific circumstances of this case.[8]

We note first that Oliver was 23 at the time of the crime. Presumably, the presumption of immaturity weakens as a defendant approaches 26. More importantly, however, the case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence: (1) their relative impulsivity; and (2) their vulnerability to peer pressure. (See, e.g., *Miller, supra*, 567 U.S. at p. 461.) There is no evidence in this case that Oliver's criminal behavior was motivated by either of these two factors.

First, we are not here presented with a situation where a youthful offender was swept up in circumstances beyond his or her control that led to an unintended death. Rather, the evidence discloses that Oliver was fully aware that Adger intended to kill Jimenez if the opportunity arose and decided—after full consideration of the situation—that the risk was worth the reward. Thus, he knew the incident involved a " 'grave risk of death.' " (*Clark, supra*, 63 Cal.4th at p. 616.) Indeed, it is clear that Oliver was "subjectively aware that his actions created a graver risk of death than any other armed robbery." (*Moore, supra*, 68 Cal.App.5th at p. 454.) Nevertheless, he actively participated. (Compare *In re Harper* (2022) 76

---

[8] We agree with the Attorney General that the state law standard applies here—whether it is "reasonably probable that a result more favorable to [Oliver] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Epps* (2001) 25 Cal.4th 19, 29 ["the *Watson* test for harmless error applies" to the denial of a right that "is purely a creature of state statutory law"]; *People v. Myles* (2021) 69 Cal.App.5th 688, 706 [applying the *Watson* standard to the erroneous admission of evidence in a section 1172.6 hearing].) However, our conclusion would be the same under any standard.

Cal.App.5th 450, 467–472 [habeas corpus petition denied where defendant's youth, even if a factor, did not change his culpability because the evidence showed he knew the plan was to kill the victim]; see also *Mitchell, supra,* 81 Cal.App.5th at p. 595 ["[E]very 18 year old understands bullet wounds require attention.  The fact of youth cannot overwhelm all other factors."].)[9]

As for peer pressure, there is no evidence that Oliver felt compelled to assist in Jimenez's murder.  Rather, the record discloses that he and Adger had been engaging in drug transactions as partners for a number of years.  And there is no indication that Oliver could not have declined to participate in the murder, as Chatman did, had he chosen to.  (Compare *People v. Ramirez* (2021) 71 Cal.App.5th 970, 991 [evidence to support a finding that Ramirez was influenced by peer pressure, including fear of death if he did not participate in the carjacking]; see also *Jones*, *supra*, 86 Cal.App.5th at p. 1093 ["In *Harris* and *Moore*, the concern was that a juvenile was vulnerable to the influence of others and could fail to appreciate the dangers of his activities and his cohort's actions."].)

Finally, Oliver has failed to present on appeal or in the court below *any* specific support for the proposition that his level of maturity somehow lessened his culpability for this murder.  Jones, in contrast, presented evidence of his "traumatic and violent" upbringing as well as under-diagnosed mental health and substance abuse issues, and "appeared to be impulsive rather than criminally sophisticated." (*Jones*, *supra*, 86 Cal.App.5th at p. 1091.)  To the contrary, although it appears that Oliver's

---

[9] Moreover, as discussed above, we do not find Chatman's testimony inherently incredible, both because it was corroborated in many respects and because he offered credible explanations as to why he initially lied to the police.

31

presentence report was not reviewed by the trial court, it is part of our record on appeal and our review discloses what his single mother described as a "normal childhood" during which he participated in typical childhood sports, school, and church activities. In addition, although Oliver had a negligible criminal history, he admitted that at the time of the murder he had been involved in illegal drug sales for approximately two years, criminal activity which he identified as "an easy way to make good money."

At oral argument in this matter, the Attorney General commented that, at bottom, age is just a proxy for maturity, and we agree. As we have discussed, Oliver's actions during this crime did not show "a transient rashness" or "inability to assess consequences." (*Miller*, *supra*, 567 U.S. at pp. 471–472.) Nor do we perceive any " 'impetuosity' " or " 'failure to appreciate risks and consequences.' " (*Moore*, *supra*, 68 Cal.App.5th at p. 454.) Rather, Oliver, well aware of " 'the particular dangers posed by the nature of the crime [and] the weapon[] [to be] used' " (*Harris*, *supra*, 60 Cal.App.5th at p, 960), made an intentional and volitional choice to take a calculated risk. That risk failed to turn out as he had hoped, not because Jimenez ended up dead, but because he and his cohorts were caught. Under such circumstances, we see no reasonable likelihood that the trial court would have reached a different conclusion had it focused specifically on Oliver's age.[10]

### III. DISPOSITION

The trial court's order denying Oliver's petition for resentencing under section 1172.6 is affirmed.

---

[10] Because we conclude that any error in failing to argue that Oliver's youth lessened his culpability was harmless, we need not reach Oliver's argument that his counsel rendered ineffective assistance for failing to raise the issue in the trial court.

DEVINE, J.*

WE CONCUR:


MARGULIES, ACTING P.J.


BANKE, J.


A161773

---

\* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br><br>KEVIN LEROI OLIVER,<br><br>     Defendant and Appellant. | A161773<br><br>(San Mateo County Super Ct.<br> No. SC026429B)<br><br>ORDER MODIFYING OPINION,<br>DENYING REHEARING, AND<br>GRANTING PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter, filed on March 16, 2023, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

It is also ordered that the opinion filed herein on March 16, 2023, be modified as follows:

1. At the bottom of page 31 continuing to the top of page 32 in the second line of the first partial paragraph, the language is modified to read as:

"…although it appears that Oliver's presentence report was not reviewed by the trial court, it is part of our record on appeal and our review

1

discloses nothing remarkable in his childhood.  In addition, Oliver admits in the report that at the time of the murder he had been involved in illegal drug sales for approximately two years, criminal activity which he identified as "an easy way to make good money."

2. After the sentence ending in "… money." on page 32, add footnote 10 to read:

"In discussing these details, we are cognizant of the conditional confidentiality afforded by California Penal Code section 1203.05 to the personal information contained in such reports as well as Oliver's request that his confidentiality be maintained.  We thus disclose personal information only to the extent pertinent to our analysis of Oliver's claim. (See Cal. Pen. Code §1203.05, subd. (c); *People v. Connor* (2004) 115 Cal.App.4th 669, 696 [under section 1203.05 court "balances the defendant's interest in keeping this information confidential against any reasonable potential benefit to be gained by disclosing it and exercises discretion concerning whether to restrict or permit access"].)"

The modification does not change the appellate judgment.  (Cal. Rules of Court, rule 8.264(c)(2).)

Respondent's petition for rehearing is denied.

Dated:

_____
Margulies, Acting P.J.

San Mateo County Superior Court

Hon. Elizabeth Hill

Counsel:

Mary K. McComb, State Public Defender under appointment by the Court of Appeal, and Caroline P. Cincotta, Deputy State Public Defender for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General and Juliet B. Haley, Deputy Attorney General for Plaintiff and Respondent.